**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| STEPHEN LEARY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| EQUIFAX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Stephen Leary ("Mr. Leary" or "Plaintiff") brings this Complaint against Defendant Equifax, Inc. ("Equifax") and sets forth the following claims:

## INTRODUCTION

1.  This case is about a company punishing a dedicated employee for refusing to "play ball" when it tried to cover up its regulatory violations that placed the financial security of everyday Americans in jeopardy. Mr. Stephen Leary is an experienced compliance professional and a licensed attorney actively barred in the State of Florida. Mr. Leary worked at Equifax in Atlanta, Georgia as an auditor from 2018 to 2020 performing Compliance Assessments on an enterprise-wide basis for Equifax as assigned to him by the Director of Regulatory Compliance Testing, Mr. Cris Smothermon. The Regulatory

Compliance Testing program was mandated by the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and required Mr. Leary and his colleagues test Equifax's compliance procedures and policies against the governing federal law and regulations.

2.   Mr. Leary's testing uncovered that Equifax committed numerous, serious violations of the Consumer Financial Protection Act ("CFPA"), the Fair Credit Reporting Act ("FCRA"), and other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction. Congress passed these laws and created the CFPB to protect every day American families who are categorically dependent on the accuracy and fairness of credit reports so that they can purchase homes, rent apartments, purchase cars, and obtain small business loans and credit cards. The violations uncovered by Mr. Leary, Mr. Smothermon, and the compliance testing team were so numerous and systemic that it was clear that Equifax had enterprise-wide compliance failures.

3.   Mr. Leary reported Equifax's compliance violations to Equifax's upper management, including Shannon Anderson, VP and Quality Manager of Customer Operations, and Adele Braxton Fields, SVP and Deputy Chief Compliance Officer. In response, instead of commending Mr. Leary's work

for identifying significant compliance exposure, Ms. Fields and Ms. Anderson tried to bury the results and told him that Equifax should report false information to appease the CFPB.

4.   Instead, Mr. Smothermon and Mr. Leary published their findings as their job duties and the CFPB required. Over the next several months, Mr. Smothermon and another member of the Compliance Testing Team were terminated, and after Mr. Leary resisted Equifax's efforts to bury his findings instead of providing truthful information, Mr. Leary was placed on a bogus performance improvement plan ("PIP") that asked him to, among other things, demonstrate that he did not have an "us vs. them mentality" with respect to himself and the company.

5.   In June 2020, when Mr. Leary learned that Equifax had provided additional false information to the CFPB in an effort to cover up Equifax's regulatory violations, Mr. Leary contacted the CFPB to correct the record and make them aware that Equifax had a pattern of covering up violations and punishing employees like him who opposed it. Mr. Leary also complained to Human Resources and Equifax's Office of the General Counsel that he was being retaliated against but still completed every task asked of him in his PIP. Regardless, on July 6, 2020, the final day of his PIP, Equifax completed its

retaliation against Mr. Leary and terminated him.

6.   As of the date of this filing, nearly every member of Equifax's compliance department during Mr. Leary's tenure is no longer with the company.

7.   Mr. Leary files this action pursuant to the Section 1057 of the CFPA, codified as 12 U.S.C. § 5567, which protects employees of consumer reporting agencies from retaliation by their employer for engaging in protected activity.

8.   The CFPA expressly protects employees like Mr. Leary who engage in protected activity within their company "in the ordinary course of the duties of the employee[.]" 12 U.S.C. § 5567(a).

9.   Mr. Leary seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement, compensatory damages, and attorneys' fees and costs of litigation.

## JURISDICTION AND VENUE

10.   Subject matter jurisdiction of this Court is invoked pursuant to 12 U.S.C. §5567(c)(4)(D)(i); *see also* 29 C.F.R. § 1985.114(a)(2).

11.   This Court has personal jurisdiction over Equifax because Equifax transacts business in Georgia, is headquartered in Atlanta, Georgia, and committed the unlawful acts that are the subject of this Complaint in Atlanta, Georgia.

12.   Venue is proper in this Court because all the complained of events occurred

in the State of Georgia.

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13.   Plaintiff satisfied all administrative prerequisites to perfect his claims under the CFPA. Specifically, Plaintiff timely filed a complaint/charge of retaliation with the United States Department of Labor ("DOL"), and there has been no final decision of the Secretary of Labor regarding Plaintiff's complaint/charge for more than 210 days. *See* 12 U.S.C. §5567(c)(4)(D)(i); 29 C.F.R. § 1985.114(a)(2).

14.   Plaintiff satisfied all the statutory prerequisites to filing this action with this Court.

## **THE PARTIES**

15.   Mr. Leary, at all times relevant to this action, was a resident of the State of Georgia. Mr. Leary now resides in the State of Utah.

16.   Mr. Leary, at all relevant times to this action, was a 'covered employee' under the CFPA, 12 U.S.C. § 5567(b), that is, an individual performing tasks related to the offering or provision of a consumer financial product or service.

17.   Equifax, Inc. is a consumer reporting agency that is incorporated in and regularly transacts business in the State of Georgia.

18.   Defendant Equifax, at all relevant times, was a 'covered person' under the

CFPA, 12 U.S.C. § 5481, that is, a person that engages in offering or providing a consumer financial product or service.

19.   Defendant Equifax may be served with a summons and copy of the Complaint in this action by delivering process to its registered agent: Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

## **STATEMENT OF FACTS**

### ***Equifax and the CFPA***

20.   Equifax is one of the three largest consumer reporting agencies in the United States.

21.   Equifax is regulated, in part, by the Fair Credit Reporting Act, codified at 15 U.S.C. §§ 1681–1681x ("FCRA"), and the Consumer Financial Protection Act of 2010 (Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act)), codified at 12 U.S.C. § 5481 *et seq*. ("CFPA"), statutes which are administered under the jurisdiction of the Consumer Financial Protection Bureau ("CFPB" or the "Bureau").

22.   With the passage of the CFPA and the creation of the CFPB, Congress created a federal system of consumer financial services regulation for credit reporting agencies, banks and nonbank lenders, mortgage originators and servicers, debt collectors and payment and money transmitters. Through the CFPB, for the

first time in American history, nonbanks like Equifax are now subject to intensive, bank-like federal regulation of their consumer financial operations.

23. In 2016, OSHA published the final text of the regulations governing the employee protection (whistleblower) provisions of the CFPA. *See* Procedures for Handling Retaliation Complaints Under the Employee Protection Provision of the Consumer Financial Protection Act of 2010, 81 Fed. Reg. 14374 (March 17, 2016) (to be codified at 29 C.F.R. pt. 1985).

### *Mr. Leary's Employment*

24. Mr. Stephen Leary is an experienced compliance professional and a licensed attorney actively barred in the State of Florida.

25. He began working at Equifax as a regulatory compliance specialist on or about May 2018, and was promoted to Senior Compliance Auditor in 2019.

26. At all times relevant, Mr. Leary worked in the Equifax Compliance Office ("ECO") on the Compliance Testing Team.

27. The Compliance Testing Team was purportedly created in response to a directive of the CFPB to ensure Equifax fulfilled its regulatory obligations.

28. Mr. Leary excelled at his role. Based on a performance evaluation finding that he "Exceeds Expectations," Mr. Leary was promoted to Senior Auditor in June 2019.

29.   Mr. Leary's primary job duty involved performing Compliance Assessments on an enterprise-wide basis for Equifax as assigned to him by the Director of Regulatory Compliance Testing, Mr. Cris Smothermon.

30.   Mr. Leary was given assignments by Equifax, some of which were mandated by the CFPB, that required he and his colleagues to test Equifax's (including its vendors' and subcontractors') compliance procedures and policies against the governing federal law and regulations, including the CFPA and the FCRA.

31.   Once a Compliance Assessment was completed and the underlying data verified, the assessment report is published internally and emailed to Executive Management, including the Chief Compliance Officer and the General Counsel.

### *Mr. Leary Conducts CCP Testing and Finds Numerous Violations Under the CFPB's Jurisdiction*

32.   Mr. Leary's assignments in 2019 included an internal testing and review of the Consumer Complaints Program ("CCP").

33.   The CFPB considers consumer complaints to be a vital indicator of the accuracy, fairness, and security of the credit reporting products sold by companies like Equifax, and the CFPB mandates that Equifax must administer the CCP pursuant to its supervisory authority over non-depository covered entities like Equifax. *See* 12 U.S.C. § 5514.

34.   The specific requirements mandated for the CCP are set forth in Dodd-Frank, particularly 12 U.S.C. § 5534, and the CFPB's Compliance Management System ("CMS") Guidelines.

35.   An entity's adherence to the CCP requirements is examined pursuant to and tested against the rules, orders, standards, and prohibitions adopted by the Bureau, including those set forth in the  CFPB's Examination Manual.

36.   Mr. Leary and his other team members designed and built the relevant tests in compliance with these rules, orders, standards, and prohibitions, and then tested the CCP processes and procedures.

37.   In or around July 2019, Mr. Smothermon assigned the primary testing responsibility of the CCP review to Mr. Leary.

38.   The project was met with resistance from senior management in Equifax's Global and Consumer and Business Services ("GCS") from its inception because GCS was aware that for years the CCP was found to be deficient in numerous areas. GCS did not want the Equifax Board or the CFPB to become aware that it had neglected to remediate these deficiencies to avoid the costs associated with the remediation.

39.   To keep those failures undisclosed, management in GCS sought to delay or even halt the CCP testing. To this end, Shannon Anderson, VP and Quality

Manager, on behalf of Tony Weeks, SVP and Senior Group Manager of GCS, lobbied Kent Linder, Chief Risk and Compliance Officer, to cancel the testing before it could be completed.

40. When Mr. Smothermon sent an email stating that the testing was set to begin and explaining the process, Mr. Weeks replied directly to Mr. Smothermon and in an unprecedented move intervened in the testing process by questioning the decision to begin CFPB's mandated testing. Ms. Anderson also reiterated her displeasure about the testing.

41. Over the course of Mr. Leary's work, he and other members of the Compliance Testing Team were met with substantial resistance from Equifax's upper management to conduct their Compliance Assessments due to concern that Equifax's numerous violations would be uncovered in the process—violations that would be reported to or viewable by the CFPB.

42. At the direction of Mr. Smothermon, Mr. Leary pressed on with his work and conducted the testing, despite upper management attempting to prevent Mr. Leary from accessing the data he needed to do the testing.

43. The results confirmed upper management's fears: By September 2019, Mr. Leary's testing uncovered that Equifax committed numerous violations of the CFPA and the rules, orders, standards, and prohibitions governing consumer

complaints adopted by the CFPB.    .

44.    Prior to reporting the test results to the ECO's upper management, Mr. Leary summarized the findings and sent them to Juan Torres, the applicable subject matter expert in GCS, to confirm the underlying facts. Mr. Torres confirmed in an email to Mr. Leary that the data was correct.

45.    Based on these findings, Mr. Leary formed a reasonable belief that Equifax had committed numerous violations of the CFPA and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction.

46.    For example: Equifax was not timely or adequately responding to CFPB portal complaints in violation of 12 USC 5534(b); was not identifying, tracking, and trending all complaints received from consumers pursuant to the CFPB's standards for effective consumer complaint management; and the ECO was reporting incorrect complaint data to Equifax's Board, compliance committee, and the CFPB.

### *Mr. Leary Reports the CCP Violations to the ECO Upper Management*

47.    Throughout September to December 2018, Mr. Leary reported Equifax's CCP compliance violations to Equifax's upper management in GCS and the ECO, including Ms. Anderson and Adele Braxton Fields, SVP and Deputy Chief Compliance Officer. The information Mr. Leary reported included, broadly,

that: (1) Equifax was not adequately responding to CFPB portal complaints as required by Dodd Frank; (2) Equifax was not responding to CFPB portal complaints within the timelines set forth by Dodd Frank's implementing regulations; (3) Equifax operations (specifically the vendors it outsources a majority of the work to) was not capturing and reporting the vast majority of complaints received;  (4) the complaint numbers reported did not align with the underlying reporting data Mr. Leary was able to examine and the ECO directed analysts to report certain non-complaint items as complaints; and (5) numerous gaps existed within the quality program that allowed these violations to occur.

48.    In response, instead of commending Mr. Leary's work for identifying significant compliance exposure, Ms. Fields and Ms. Anderson tried to bury the results. For example, they resisted Mr. Leary and Mr. Smothermon publishing the CCP compliance report that detailed many of Equifax's violations, even though failing to publish the report would cause Equifax to willingly commit another serious violation of the CFPA and CFPB regulations.

49.    Ms. Fields even went so far as to tell them that one violation—that Equifax failed to report the accurate number of consumer complaints—should not be

published at all, and that Equifax should just continue to submit false numbers to appease the CFPB.

50.    The CFPA provides that "It shall be unlawful for any covered person….to fail or refuse, as required by Federal consumer financial law, or any rule or order issued by the Bureau thereunder…to provide information to the Bureau" 15 U.S.C. § 5536.

51.    When Mr. Leary and Mr. Smothermon submitted the final draft report detailing the CCP findings to Ms. Anderson, she was furious and immediately requested a next-day meeting with Mr. Linder and Mr. Smothermon to object to the findings, after previously verifying their accuracy—while providing no factual basis for her objections.

52.    This was not the first time that Mr. Leary and Mr. Smothermon had been asked to alter or withhold compliance testing findings. For example, by this point, Mr. Leary and Mr. Smothermon had been asked to delete testing findings that cast Equifax as a violator of laws, rules, orders, standards, and/or prohibitions under CFPB's jurisdiction on multiple occasions.

53.    In January 2020, Mr. Smothermon and Mr. Leary published the CCP findings as required by Equifax's own Board-approved Compliance Policy and the CFPB's guidelines for compliance management by circulating the final report

to Equifax's executive management, including the Chief Compliance Officer and General Counsel. They also recorded the details of the test work performed in the Archer GRC tracking tool pursuant to established ECO policy and procedures.

### *Equifax Decapitates the Compliance Testing Team and Fills the Team with GCS Suppliants*

54.   Equifax's retribution for publishing the CCP findings was swift: Ms. Fields and Ms. Anderson became upset with Mr. Leary and Mr. Smothermon, and within approximately one month of publication, in February 2020, Mr. Smothermon and Fred Paduano, another member of the Compliance Testing Team who pushed back against Equifax's efforts to hide violations from the CFPB, were abruptly terminated purportedly due to their positions being "eliminated."

55.   Following Mr. Smothermon's termination, Mr. Leary was assigned a new supervisor, Molly Whitehouse.

56.   Ms. Whitehouse had little to no relevant compliance experience and reported directly to Ms. Fields. Ms. Whitehouse's lack of compliance experience was evident when she asked on a group call if she was "going to have to read regulations."

57.   Ms. Whitehouse had very little interaction with Mr. Leary as she worked out of her home in New Jersey, never met Mr. Leary or the members of the testing team during Mr. Leary's tenure, and only worked half-days.

58.   Ms. Whitehouse was a close associate of Ms. Anderson and Mr. Weeks and reported directly to Ms. Fields.

### Mr. Leary's FCRA testing reveals hundreds of thousands of FCRA violations

59.   Prior to the terminations of Mr. Smothermon and Mr. Paduano, Mr. Leary was also performing additional assigned Compliance Assessments of certain FCRA requirements. In January 2020, Mr. Leary's scoping of this testing revealed that Equifax had missed hundreds of thousands of dispute processing deadlines imposed by FCRA under 15 U.S.C. § 1681i in the second half of 2019 alone, and that it was not clear that all these failures had been adequately self-reported as claimed or that the underlying causes of the failures had been addressed.

60.   Based on this initial discovery, Mr. Leary formed a reasonable belief that Equifax had committed thousands of violations of the FCRA and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction.

61.   In January 2020, Mr. Leary presented this information about the FCRA violations to Sarah Cunningham, a new employee that Ms. Anderson had

hired at the beginning of 2020 and to whom all new testing requests must go. When presenting this information, Mr. Leary made a formal information request to Ms. Cunningham for specific data he required to complete the testing. In response, Ms. Cunningham became angry and told him that she would not give him the information required to do the testing and that he needed to "rethink" the way he conducted testing.

62.   After Mr. Smothermon's termination, Ms. Whitehouse, at the direction of Ms. Fields, told Mr. Leary to "pause" this FCRA testing altogether and Mr. Leary was never allowed to continue his investigation or report his findings.

### Mr. Leary Objects to ECO Upper Management's Instructions to Submit False Data to the CFPB

63.   In April 2020, Ms. Whitehouse and Ms. Cunningham instructed Mr. Leary to reword and "repackage" all of the testing findings discovered by Mr. Leary, Mr. Smothermon, and Mr. Paduano, instead of addressing the reported violations. Ms. Whitehouse specifically instructed Mr. Leary to ignore his findings, make the existing data work, and to falsely state—on reports accessible to the CFPB—that Equifax had remedied any identified issues, when Ms. Whitehouse knew this to be false based on Mr. Leary's verified findings and continued feedback to Ms. Whitehouse that the findings had not been adequately remediated.

64.   In response, Mr. Leary objected to Ms. Whitehouse's instruction to ignore and otherwise close the unremediated findings and on May 5, 2020, he forwarded Ms. Whitehouse the email of Mr. Torres confirming the accuracy of Mr. Leary's CCP findings about the numerous unremedied CCP violations.

### *Equifax Retaliates against Mr. Leary*

65.   On May 14, 2020, Equifax retaliated against Mr. Leary by effectively stripping him of his job duties and placing him on an unsubstantiated performance improvement plan, which included nebulous requirements such as the demand that he improve his "tone" and that he "provide evidence that he does not have an us-vs.-them mentality."

66.   Mr. Leary's PIP was particularly bogus because Mr. Leary had received a glowing performance review by Mr. Smothermon just weeks prior to receiving the PIP. Mr. Smothermon had personally supervised Mr. Leary for nearly two years at the time he made his review. In contrast, Ms. Whitehouse had only been Mr. Leary's supervisor for approximately two months when she gave him a PIP, and Ms. Whitehouse—who worked in New Jersey—had never personally met Mr. Leary and had little to no contact with him during the half-days that she worked.

67.   Mr. Leary completed every task assigned to him, despite the obvious

retaliatory nature of the PIP.

### *Mr. Leary provides information to the CFPB and complains to Equifax of retaliation*

68. In mid-2019, Mr. Leary was also tasked with designing and conducting Compliance Assessments of Equifax's Data Furnisher Monitoring Program ("DFMP") to ensure that the program was in compliance with CFPB guidance interpreting § 607(b) of the FCRA and prior agreements with the CFPB to remediate prior violations.

69. The overall purpose of the FCRA's regulation of Equifax (through the CFPB) with respect to data furnishers was to ensure that Equifax had reasonable procedures in place for ensuring maximum accuracy of consumer credit reports.

70. Mr. Leary was assigned to review the DFMP by Mr. Smothermon because Mr. Smothermon's risk assessments had indicated the DFMP was potentially deficient, and the CFPB was scheduled to perform their own official supervisory examination of the program later that year. Pursuant to his obligations as the Director of Compliance Testing, Mr. Smothermon wanted to ensure any deficiencies were identified and remediation plans put in place to ensure Equifax was complying with the FCRA and the CFPB's rules, orders, standards, and prohibitions regarding furnisher monitoring prior to the

CFPB's examination.

71.   Mr. Leary conducted the DFMP review and discovered the program was in fact deficient as Mr. Smothermon had originally assessed, and that significant risk existed that Equifax was violating FCRA 15 U.S.C. § 1681e(b) as well as prior CFPB supervisory orders.

72.   Mr. Leary and Mr. Smothermon published the final furnisher monitoring report to Equifax's senior management after significant delay and interference from Ms. Fields, reporting that Equifax had potentially violated the FCRA, the CFPB's guidance regarding data furnisher monitoring, and numerous violations of Equifax's previous agreements with the CFPB on the subject. On July 3, 2019, Mr. Leary had submitted this assessment's preliminary findings to Ms. Fields, who modified the findings at her discretion, and on September 20, 2019, after publishing this final, modified version of the report to Equifax's senior management as previously stated, Mr. Smothermon re-submitted the final report to Ms. Fields because Mr. Smothermon became aware that the CFPB was directly requesting it, and Ms. Fields had been tasked with overseeing, providing documents, and otherwise adequately responding to the CFPB's examination requests as mandated by the CFPA.

73.   However, despite Mr. Leary's testing and Mr. Smothermon's circulation of

the final report of their DFMP review to senior management and Ms. Fields, on or around May 2020, the CFPB provided Equifax with their official Supervisory Letter regarding the DFMP and furnisher monitoring compliance. In the Letter, the CFPB was under the erroneous impression that no DFMP compliance audit (Compliance Assessment) had been scheduled or conducted during a review period that included 2019, and the Bureau independently confirmed the substance of Mr. Leary's DFMP findings, stating directly that Equifax had in fact violated the FCRA 15 U.S.C. § 1681e(b), and that Equifax's Data Furnisher Monitoring Program was seriously deficient.

74.   The CFPB's finding that Equifax did not do a DFMP Compliance Assessment during the review period was based on false information provided by Equifax in direct violation of 15 U.S.C. § 5536, as Mr. Leary had personally conducted such a Compliance Assessment in 2019 at the direction of Mr. Smothermon as previously described.

75.   In response, in June 2020, Mr. Leary had several direct communications with the CFPB. Through these communications, Mr. Leary discussed how he believed Equifax and/or Ms. Fields had falsely told the CFPB that Equifax did not conduct DFMP testing and thus did not have any data on DFMP testing, which was in direct violation of 15 U.S.C. § 5536. Mr. Leary provided CFPB

20

with Equifax's DFMP report as well as his original, unmodified findings that showed multiple violations of FCRA and/or other laws, rules, orders, standards, and/or prohibitions under the CFPB's jurisdiction. Mr. Leary explained that this report demonstrated that Equifax and/or Ms. Fields: (1) lied to CFPB about the testing Equifax conducted, including the negative results of that testing, (2) failed/refused to provide the information contained in the assessment report to the Bureau as required by the CFPB, and (3) attempted to cover up Equifax's regulatory violations.

76. Mr. Leary also informed the CFPB at this time that Equifax, the ECO, and Ms. Fields had a pattern of modifying testing reports to make the findings appear to be less significant than discovered by the testing team, and that Equifax serially retaliated against employees who pushed back against this practice, including himself, Mr. Smothermon, and Mr. Paduano.

77. In his communications with the CFPB in June 2020, Mr. Leary also provided the CFPB with a report on Equifax's identity theft program which Mr. Leary had participated in and had been completed by his colleague Mr. Paduano, which demonstrated that Equifax and/or Ms. Fields had also failed/refused to provide the information contained in the report to the Bureau as required by the CFPB and in direct violation of 15 U.S.C. § 5536, and instead had

attempted to cover up Equifax's regulatory violations regarding blocking information when FTC ID Theft Reports were received.

78. On information and belief, the CFPB communicated to Equifax and/or Ms. Fields that it had learned of their failure/refusal to provide the information contained in the furnisher monitoring and identify theft reports to the Bureau as required by the CFPB.

79. On information and belief, upon learning that the CFPB had obtained the furnisher monitoring and identify theft reports from someone else at Equifax, Ms. Fields knew that Mr. Leary was the individual who provided the CFPB with one or both reports.

80. On June 3, 2020, Mr. Leary and his attorney complained in a detailed letter to Equifax's Associate General Counsel, Suzanne Alford, that he was being retaliated against in violation of 12 U.S.C. § 5567 and 29 C.F.R. 1985 based on his protected activity of reporting violations under CFPB jurisdiction and opposing activities that would constitute additional violations under CFPB jurisdiction.

81. In June 2020, Mr. Leary's attorney spoke to Ms. Alford and told her that Mr. Leary was speaking to the CFPB about the compliance testing team's findings.

82. On June 15, 2020, Mr. Leary sent an email to HR Senior Director Christa Sinagra, complaining that he was being retaliated against, that his previous complaints to HR about the retaliation were being ignored, and that he had retained counsel with respect to Equifax's ongoing retaliation. Ms. Sinagra did not respond to Mr. Leary and was later promoted to Vice President of Human Resources.

83. On July 6, 2020, the final day of his PIP, Equifax completed its retaliation against Mr. Leary and terminated him.

## **COUNT ONE**
### **(CFPA – Unlawful Discharge/Retaliation in Violation of 12 U.S.C. § 5567)**

84. Plaintiff incorporates paragraphs 1 through 83 as set forth above, with the same force and effect as though fully set forth herein.

85. This Count is brought under the CFPA, Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 12 U.S.C.A. § 5567.

86. At all relevant times, the Defendant in this case was a consumer reporting agency that was a 'covered person' under the CFPA, 12 U.S.C. § 5481, that is, a person who engages in offering or providing a consumer financial product or service. 29 C.F.R. § 1985.101(j)(1).

87. At all relevant times, Plaintiff was a "covered employee" of a "covered person," that is, an individual performing tasks related to the offering or

provision of a consumer financial product or service. 29 C.F.R. § 1985.101)(i).

88.    Plaintiff engaged in protected activity under 12 U.S.C. § 5567(a)(1), including: **(1)** providing information to Equifax relating to its numerous, serious violations of the CFPA, the FCRA, and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction; **(2)** providing information to the CFPB relating to Equifax's numerous, serious violations of the CFPA, the FCRA, and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction; and **(3)** providing information to Equifax's Human Resources department and the Office of the General Counsel that he was being subjected to a retaliatory PIP because he reported said violations and objected to Equifax committing additional violations of the CFPA, the FCRA, and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction. These protected activities plainly fall within 12 U.S.C. § 5567(a)(1), insofar as Plaintiff provided this information to Equifax and the CFPB with a reasonable belief, both subjective and objective, that the information related to acts and/or omissions that constituted violations of the CFPA, the FCRA, and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction. This

included violations of 15 U.S.C. § 5536, which provides that "It shall be unlawful for any covered person….to fail or refuse, as required by Federal consumer financial law, or any rule or order issued by the Bureau thereunder…to provide information to the Bureau."

89.   Plaintiff engaged in protected activity under 12 U.S.C. § 5567(a)(4), including: **(1)** objecting to Equifax and his superiors concealing from the CFPB that it had committed violations of, and/or the information supporting violations of, the CFPA, the FCRA, and/or other laws, rules, orders, standards, and prohibitions under the CFPB's jurisdiction; **(2)** objecting to Equifax and his superiors ordering him to knowingly and willfully provide false information to the CFPB; and **(3)** objecting to Equifax's retaliatory PIP as a violation of the anti-retaliation provisions of the CFPA. These protected activities plainly fall within 12 U.S.C. § 5567(a)(4), insofar as Plaintiff objected to an activity, policy, practice, or assigned task that Plaintiff reasonably believed to be in violation of a law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the CFPB. This included violations of 15 U.S.C. § 5536, which provides that "It shall be unlawful for any covered person….to fail or refuse, as required by Federal consumer financial law, or any rule or order issued by the Bureau

thereunder…to provide information to the Bureau."

90. The CFPA considers Plaintiff's objection to his superiors as protected activity regardless of whether that objection was done at his own initiative or "in the ordinary course of [his] duties." 12 U.S.C. § 5567(a).

91. Mr. Leary can show that any number of the protected activities in which he engaged was a contributing factor to Equifax's decision to place Mr. Leary on a PIP and terminate him.

92. Defendant Equifax cannot show by clear and convincing evidence that it would have placed Mr. Leary on a PIP and terminated him had Mr. Leary not engaged in protected activity.

93. As a result of Defendant's unlawful employment practice, Plaintiff has suffered and continues to suffer injury, with resulting monetary, economic and other damages, including without limitation: (i) lost wages; (ii) lost back pay; (iii) lost benefits; (iv) lost interest; (v) lost retirement benefits and earnings; and (vi) attorneys' fees and costs. Plaintiff is entitled to front pay in lieu of reinstatement and to recover monetary and other damages, interest (pre-judgment and post-judgment), and attorneys' fees and costs from Defendant.

94. As a result of Defendant's unlawful employment practice, Plaintiff has, in addition, suffered and continues to suffer, among other things, from lasting

and irreparable injury, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation. Plaintiff is entitled to recover compensatory damages for such injuries from Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Leary demands a **TRIAL BY JURY** and that the following relief be granted:

A.      That this Court take jurisdiction of this matter;

B.      That process be served on Defendant;

C.      That Mr. Leary be awarded a declaratory judgment that Defendant violated Plaintiff's rights under the CFPA by terminating him;

D.      That this Court enter a permanent injunction, prohibiting Defendant from engaging in unlawful employment practices in violation of the CFPA;

E.      That this Court order Defendant to make the Plaintiff whole by providing Plaintiff with compensation for the losses outlined in ¶¶ 93-94, together with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of the unlawful employment practices of Defendant;

F.      That this Court order Defendant to make the Plaintiff whole by providing compensation for future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial;

G.      That this Court order Defendant to make the Plaintiff whole by providing compensation for future nonpecuniary losses, resulting from the unlawful employment practices complained of above, including emotional pain, suffering, depression, anxiety, loss of enjoyment of life, humiliation, and other physiological and psychological symptoms and conditions, in amounts to be determined at trial;

H.      That this Court award Plaintiff his attorneys' fees and costs in pursuing this action;

I.      That this Court order Defendant to reinstate the Plaintiff to his position or otherwise issue appropriate equitable relief, including front pay;

J.      That this Court award Plaintiff pre-judgment and post-judgment interest on any sums determined due and owing from Defendant, including interest on attorneys' fees and costs;

K.      That the Court grant to Mr. Leary the right to have a trial by jury on all issues triable to a jury; and

L.      That the Court grant such additional relief as the Court deems proper and just.

Respectfully submitted this 13th day of June, 2022.

**BUCKLEY BEAL LLP**

*/s/ Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com
Andrew R. Tate
Georgia Bar No. 518068
atate@buckleybeal.com

600 Peachtree Street, NE, Ste. 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

*Counsel for Plaintiff*